UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

MAZDAK POURABDOLLAH
TOOTKABONI and
ARGHAVAN LOUHGHALAM,

    *Petitioners,*

          v.

DONALD TRUMP, President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY ("DHS"); U.S.
CUSTOMS AND BORDER PROTECTION
("CBP"); JOHN KELLY, Secretary of DHS;
KEVIN K. MCALEENAN, Acting
Commissioner of CBP; and WILLIAM
MOHALLEY, Boston Field Director, CBP,

    *Respondents.*

Case No.17-10154

**MEMORANDUM IN SUPPORT OF MOTION BY COMMONWEALTH OF
MASSACHUSETTS AND UNIVERSITY OF MASSACHUSETTS TO INTERVENE**

    The Commonwealth of Massachusetts and the University of Massachusetts ("UMass") (collectively, the "Commonwealth") submit this memorandum of law in support of their motion to intervene as plaintiffs in this action. For the reasons set forth below, allowing the Commonwealth to intervene is necessary to fully protect its own interests in this litigation and will not prejudice any other party. Accordingly, the Commonwealth's motion to intervene as a matter of right or, in the alternative, by permission, should be allowed.

**BACKGROUND**

    This case, which was initiated in the late hours of January 28, 2017, arose out of the unconstitutional detention of two lawful permanent residents of the United States upon their arrival at Logan International Airport. Acting pursuant to the Executive Order at issue in the

Proposed Complaint, Customs and Border Protection detained Mazdak Pourabdollah Tootkaboni and Arghavan Louhghalam in secondary screening for several hours, and took this action for no reason other than that these two professors at UMass-Dartmouth are nationals of Iran. This Court issued a temporary restraining order early on January 29, 2017, enjoining the Defendants from removing or detaining individuals based solely on the Executive Order. This Court's order was one of three restraining orders issued by federal courts during the first weekend after the Executive Order went into effort.

The confusion, disruption, and fear caused by the Executive Order necessitate swift action by the courts. Since its issuance, many individuals inside and outside of the country have suffered violations of their legal and constitutional rights. Businesses, hospitals, universities, and other entities have been required to make contingency plans, prepare for operational disruptions, and scramble to return their personnel to the country. Respondents have purported to clarify that the Executive Order does not apply to lawful permanent residents (even though they are expressly covered by the Executive Order), but have not taken any official steps to amend or rescind the Executive Order.

The Commonwealth seeks to intervene in order to assert its unique interests in this litigation. As set forth in detail in the Proposed Complaint, the Executive Order affects the Commonwealth in at least four ways: (1) it disrupts the operations of Commonwealth agencies and public institutions, including UMass and its medical school, that educate, employ, and serve persons from the affected countries, including, in particular, UMass's ability to staff and retain faculty positions, take on international scholars, admit students into both undergraduate and graduate programs, and permit its faculty and students from the affected countries to leave the United States on university business; (2) it similarly disrupts the operations of small and large

Massachusetts businesses and industries that employ or recruit individuals from the affected countries, and thus places the state at a competitive disadvantage with other international centers of life sciences, education, and medicine, directly harming the overall economy and public fisc of the Commonwealth; (3) it requires the Commonwealth, through its agencies and other institutions, to make employment and admission decisions that are dictated by the Executive Order, in violation of state anti-discriminations laws and the state and federal constitutions; and (4) it precludes the Commonwealth and its agencies from enforcing Massachusetts' anti-discrimination laws against employers and others who act consistently with the unlawful Executive Order.  The Executive Order and actions taken to enforce it by federal officials are unconstitutional, arbitrary and capricious, and otherwise contrary to law. The Commonwealth seeks an order declaring the Executive Order unconstitutional and permanently enjoining its enforcement.

## ARGUMENT

### I.     THE COMMONWEALTH IS ENTITLED TO INTERVENE AS OF RIGHT.

The Commonwealth satisfies the requirements for intervention as of right.  Rule 24(a)(2) of the Federal Rules of Civil Procedure allows intervention as of right for any party that "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

The First Circuit applies the following four-factor test for intervention by right under Fed. R. Civ. P. 24(a)(2): "a would-be intervenor must demonstrate that: (i) its motion is timely; (ii) it has an interest relating to the property or transaction that forms the foundation of the ongoing action; (iii) the disposition of the action threatens to impair or impede its ability to protect this

3

interest; and (iv) no existing party adequately represents its interest." *Ungar v. Arafat*, 634 F.3d 46, 50 (1st Cir. 2011) (citation omitted).  The Commonwealth satisfies each of these factors.

### A. The Commonwealth's Motion is Timely.

The Commonwealth has moved in very timely fashion to intervene.  Timeliness, which "is of first importance," *United Nuclear Corp. v. Cannon*, 696 F.2d 141, 143 (1st Cir. 1982), is determined by considering "the totality of the relevant circumstances," *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, 1230 (1st Cir. 1992) (citations omitted).  A motion to intervene is timely if it is "filed promptly after a person obtains actual or constructive notice that a pending case threatens to jeopardize his rights." *R & G Mortgage v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 7 (1st Cir. 2009).  That has clearly occurred here.  The Commonwealth is moving to intervene in this case's early infancy: only four days after the President issued the Executive Order (January 27), and three days after petitioners filed suit (January 28).

Allowing the Commonwealth to assert its interests at this early stage will not complicate or delay proceedings or otherwise create any "foreseeable prejudice to the existing parties." *Navieros Inter–Americanos, S.A. v. M/V Vasilia Exp.*, 120 F.3d 304, 321-22 (1st Cir. 1997).  By contrast, the Commonwealth would suffer substantial prejudice were it not allowed to intervene in this action to protect its important interests set out above.  *See supra* at 2-3 and *infra* at 4-7.  Under these circumstances, the Commonwealth's motion to intervene is timely.

### B. The Commonwealth Has Important Interests in this Action.

The Commonwealth has sufficient interests in this action to justify intervention as of right.  To satisfy this second requirement, the movant must identify an interest "relating to the property or transaction that is the subject of the action." Fed. R. Civ. P. 24(a)(2).  The interest must be "direct" and "significantly protectable," *Ungar*, 634 F.3d at 51 (quoting *Donaldson v.*

*United States*, 400 U.S. 517, 531 (1971)), but it need not "be of a legal nature identical to that of claims asserted in the main action," *In re Lopez Soto*, 764 F.2d 23, 26 (1st Cir. 1985) (citation omitted).

First, as the Commonwealth's proposed Complaint sets out in detail, the Commonwealth, its agencies, and UMass in particular are suffering and will continue to suffer disruption and other harms from the Executive Order. UMass is facing multiple immediate operational and business disruptions. Indeed, the two original petitioners in this action, unlawfully detained at Logan Airport, are associate professors at UMass Dartmouth who were returning home from an academic conference. Thus, the travel ban immediately and adversely affects important state business.

At its state colleges and universities, the Commonwealth depends upon the unique specialized knowledge and experiences of foreign nationals, including those from the affected countries, as scholars, teachers, employees, and contributors to our university communities, teaching hospitals, and other educational institutions. By limiting the ability of individuals to leave the United States and return as otherwise permitted by law—and as contemplated when they initially were employed or enrolled—the Executive Order deprives UMass and other educational institutions of the full benefit of their contributions to the education of our students and workforce. The students, faculty, researchers, clinical professionals, and other employees who are adversely affected by the Executive Order are effectively unable to leave the United States without risking the inability to return to work or school. These individuals are thus unable to attend academic and professional conferences, seminars, and other academic gatherings

outside of the United States, which interferes with their academic work and frustrates the mission of the university system.

In addition, UMass needs to know that faculty members will be available to teach courses. With the Executive Order in effect, UMass will be unable to hire faculty, lecturers, or visiting scholars from the affected countries who may be unable to fulfill such teaching obligations as a result of the Executive Order. If the approximately 120 UMass employees from the affected countries with temporary status lose their work authorization, UMass will be required to expend additional time and resources to fill their jobs and will be at risk of having no faculty to teach certain courses for at least a period of time. UMass will also suffer effects relating to its admission of incoming students, as well as the placement of medical residents at UMass-Memorial Medical Center. Given the breadth and substantial impact of the Executive Order, the Commonwealth's interests are sufficiently significant to warrant intervention.

Second, hundreds, if not thousands, of Massachusetts small and large businesses, non-profit organizations, public and private hospitals, and colleges and universities are similarly disrupted by the Executive Order. These institutions collectively employ and enroll individuals from the affected countries and rely on their expertise, skill, labor, and other contributions to our economy and civic society. These institutions also engage in a constant exchange of information, personnel, and ideas with international partners and collaborators—exchanges that are hampered or precluded by the Executive Order. By undermining these organizations' operations and productivity, the Executive Order adversely affects the Commonwealth's overall economy and competitiveness, including vis-à-vis international competitors that will become

more attractive locations for conferences, meetings, investment, and other engines of economic growth.

Third, sovereign and proprietary interests of the Commonwealth uniquely support its intervention.  The Order requires the Commonwealth, in its agencies and universities, to make employment and admission decisions that are dictated by the Executive Order, which is itself an act of unlawful discrimination.  And the Executive Order prevents the Commonwealth from promoting and enforcing a regime of non-discrimination under its state constitution and laws with respect to employers and others who act consistently with this unlawful order.  Generally, citizens and businesses in Massachusetts, including the Commonwealth itself, are prohibited by state law from taking national origin and religion into account in determining to whom to extend employment and other opportunities. The Executive Order now effectively mandates such discrimination, thereby rescinding the Commonwealth's historic protection of civil rights and religious freedom.  This invasion of sovereignty exceeds any of the federal government's enumerated powers, and violates the Tenth Amendment.

The breadth and substantial impact of the Executive Order, and in particular its impact on the Commonwealth's sovereign interests, warrant intervention.

### C. The Commonwealth's Interests Will Be Impaired Absent Intervention.

The Commonwealth needs to intervene in order that its interests not be impaired.  In addition to establishing a sufficient interest in the subject of the action, the proposed intervenor must demonstrate that disposition of that action may, as a practical matter, "impair[s] or impede[s] its ability to protect this interest." Fed. R. Civ. P. 24(a)(2).  In determining whether this requirement is met, courts consider "the practical consequences of denying intervention."

*Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (citation and internal quotation omitted); *accord Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 110-11 (1st Cir. 1999) (holding that "'practical' test of adverse effect that governs under Rule 24(a)" was "easily satisfied" by showing that proposed intervenor's interests would be "adversely affected" if lawsuit were lost).

An action by the state Attorney General uniquely protects the interests of the Commonwealth in challenging the Executive Order. In Massachusetts, the Attorney General has a broad statutory and common law mandate to represent the public interest. *Attorney General v. Dime Sav. Bank*, 413 Mass. 284, 287 (1992). Under Mass. Gen. L. c. 12, §§ 3 and 3E, the Attorney General alone has control over litigation involving the Commonwealth and its agencies and officials, and is uniquely charged with protecting the Commonwealth's interests in court. *Clerk of the Superior Court v. Treasurer & Receiver Gen.*, 386 Mass. 517, 526 (1982).

An adverse ruling in this litigation would have considerable practical consequences for the Commonwealth. As discussed above, the Executive Order disrupts and interferes with the operations of the state's colleges and universities, including the recruitment, selection, and retention of faculty and students. By hindering the free exchange of information, ideas, and talent, the Executive Order undermines the Commonwealth's life sciences, technology, finance, health care, and other industries, thus inflicting economic harm on the Commonwealth itself, including decreased tax and other revenues. The Executive Order also prevents or discourages travel and emigration to the Commonwealth and interferes with the Commonwealth's sovereign interest in protecting the health, safety, and well-being of all its residents, including against the special harms caused by discrimination based on race, religion, and national origin.

Accordingly, the Commonwealth satisfies the "impairment of interest" requirement for intervention as of right.

### D. Existing Parties Do Not Adequately Represent the Commonwealth's Interests.

Finally, no existing party adequately represents all of the Commonwealth's interests in this matter. The burden of showing that a proposed intervenor's interests will not be adequately represented by existing parties is a "minimal" one. See *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *Maine v. Director, U.S. Fish & Wildlife Serv.*, 262 F.3d 13, 18 (1st Cir. 2001). The intervenor "need only show that representation may be inadequate, not that it is inadequate." *Conservation Law Found. of N. Eng. v. Mosbacher*, 966 F.2d 39, 44 (1st Cir. 1992) (citing *Trbovich*, 404 U.S. at 538 n.10).

Here, the Commonwealth more than satisfies that minimal burden. Its interests are clearly not represented by defendants, insofar as the federal government seeks to defend the constitutionality of the Executive Order. Furthermore, the Commonwealth's interests are "sufficiently different in kind or degree from those" of the petitioners. *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.*, 440 F.3d 541, 546 (1st Cir. 2006) (citations omitted). First, the Commonwealth has institutional interests relating to the operation of all its agencies and public institutions, including its public colleges and universities. Second, the Commonwealth is concerned with the economic well-being of the state economy as a whole, including its various business and non-profit sectors in which staff and services are specifically affected by the Executive Order. Finally, the Commonwealth has sovereign interests that no other party could represent. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (state interests are entitled to "special solicitude"). Consequently, no existing party can be expected to adequately represent the Commonwealth's specific interests in this matter.

## II.  IN THE ALTERNATIVE, THE COURT SHOULD EXERCISE ITS DISCRETION TO GRANT PERMISSIVE INTERVENTION.

Even if the Court concludes that the Commonwealth does not meet the standard for intervention as a matter of right, it should nevertheless exercise its discretion to permit the Commonwealth to intervene in this litigation. *See, e.g.*, *Morra v. Casey*, 960 F. Supp. 2d 335, 338 (D. Mass. 2013) (concluding that while proposed intervenor was not entitled to intervene as of right, "[n]evertheless, the court may allow [the proposed intervenor] to intervene under Rule 24(b)(2)").

Permissive intervention is appropriate where a party "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). Courts have "broad discretion" in deciding whether or not to grant permissive intervention under Rule 24(b). *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 641 (1st Cir. 1989). The First Circuit has articulated three factors to be considered in determining whether permissive intervention is warranted, including whether: "(i) the applicant's claim or defense and the main action have a question of law or fact in common; (ii) the applicant's interests are not adequately represented by an existing party; and (iii) intervention would not result in undue delay or prejudice to the original parties." *In re Thompson*, 965 F.2d 1136, 1142 n.10 (1st Cir. 1992) (citation omitted).

For the reasons discussed above, the Commonwealth satisfies all three of these considerations. Allowing the Commonwealth to intervene would not delay any aspect of this proceeding nor cause any prejudice to the existing parties. Further, the Commonwealth's interests are broadly implicated by the unconstitutional Executive Order, and those interests are not adequately represented by the individual petitioners. Indeed, permitting the Commonwealth to present in concrete terms the impact that the Executive Order will have on a broad array of governmental activities will allow the Court to better assess its constitutionality. *See Daggett,*

172 F.3d at 113 ("The fact that the applicants may be helpful in fully developing the case is a reasonable consideration in deciding on permissive intervention.") (citation omitted). The Commonwealth should therefore be allowed to intervene by permission.

## CONCLUSION

For the above-stated reasons, the Commonwealth of Massachusetts and UMass should be allowed to intervene as of right in this matter. In the alternative, the Court, in its discretion, should permit the Commonwealth and UMass to intervene.

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS
UNIVERSITY OF MASSACHUSETTS

ATTORNEY GENERAL
MAURA HEALEY


*/s/ Elizabeth N. Dewar*
Elizabeth N. Dewar, BBO# 680722
Genevieve C. Nadeau, BBO# 677566
Jonathan B. Miller, BBO# 663012
Assistant Attorneys General
One Ashburton Place
Boston, MA 02108
617-963-2204 (Dewar)
617-963-2121 (Nadeau)
617-963-2073 (Miller)
Bessie.Dewar@state.ma.us
Genevieve.Nadeau@state.ma.us
Jonathan.Miller@state.ma.us

Dated: January 31, 2017

**CERTIFICATE OF SERVICE**

    I, Elizabeth N. Dewar, hereby certify that a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on this date.


Dated: January 31, 2017          */s/ Elizabeth N. Dewar*
                                                  Elizabeth N. Dewar