## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARGHAVAN LOUHGHALAM and, MAZDAK POURABDOLLAH TOOTKABONI<br>*Plaintiff-Petitioners*,<br><br>FATEMEH YAGHOUBI MOGHADAM, BABAK YAGHOUBI MOGHADAM, ALI SANIE, ZAHRASADAT MIRRAZI RENANI, LEILY AMIRSARDARY, and OXFAM AMERICA, INC.<br>*Plaintiffs*,<br><br>v.<br><br>DONALD TRUMP, President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY ("DHS"); U.S. CUSTOMS AND BORDER PROTECTION ("CBP"); JOHN KELLY, Secretary of DHS; KEVIN K. McALEENAN, Acting Commissioner of CBP; and WILLIAM MOHALLEY, Boston Field Director, CBP,<br>*Defendants*. | No.17-cv-10154-NMG |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This is a suit on behalf of noncitizens who are lawfully in the United States after being thoroughly vetted by the U.S. government, and on behalf of Oxfam America, Inc., a U.S. organization dedicated to reducing poverty around the world. Oxfam and the noncitizens—including five lawful permanent residents—are victims of Section 3 of President Donald Trump's Executive Order ("EO") of January 27, 2016, which bars entry into the United States by nationals of seven Muslim-majority countries.

2.     Issued a week after his inauguration, the EO fulfills President Trump's campaign promise to institute a "Muslim ban."  As Acting Attorney General Sally Yates put it yesterday, in a letter that reportedly led to her dismissal, "statements made by an administration or it[s] surrogates close in time to the issuance of an Executive Order . . . may bear on its purpose."

3.     In other words: if an Executive Order looks like a Muslim ban, acts like a Muslim ban, and has been talked about as a Muslim ban, then it's probably a Muslim ban.

4.     Consistent with its purpose, the EO's effects were immediate and catastrophic.  It yielded unlawful detention in Boston's Logan Airport; required noncitizens who reside in the United States to cancel international travel that could leave them no means to return home to the U.S.; stranded U.S. residents who had already traveled overseas; and prevented institutions of learning from accessing information and participating in a free exchange of ideas.

5.     The EO is so contrary to the laws, Constitution, and traditions of the United States that it is almost literally indefensible.  As alleged below, the EO violates equal protection guarantees against discrimination based on religion and national origin, the First Amendment's Establishment Clause, First Amendment protections for sharing ideas and petitioning the government, constitutional due process guarantees, and the Administrative Procedure Act.  The individual plaintiffs[1] and Oxfam therefore seek a declaration that Section 3 is unlawful, an injunction preventing defendants from enforcing it, and an order requiring defendants to alert airlines about this relief, so that the Executive Order's disastrous consequences are ended as swiftly as they began.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1361, 2241, 2243, and the Suspension Clause of the U.S. Constitution.  This Court has further remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

7.     Venue properly lies within the District of Massachusetts because a substantial part of the events or omissions giving rise to this action has occurred in

---

[1] Plaintiff-petitioners Pourabdollah Tootkaboni and Arghavan Louhghalam, and Plaintiffs Fatemeh Yaghoubi Moghadam, Babak Yaghoubi Moghadam, Ali Sanie, Zahrasadat Mirrazi Renani, and Leily Amirsardary are collectively referred to as the "individual plaintiffs".

the District, the individual plaintiffs all reside in Massachusetts, and Oxfam has its principle place of business in Massachusetts. 28 U.S.C. § 1391.

## PARTIES

8. Plaintiff-petitioner Mazdak Pourabdollah Tootkaboni is an Iranian national and a lawful permanent resident of the United States. .

9. Plaintiff-petitioner Arghavan Louhghalam is an Iranian national and a lawful permanent resident of the United States.

10. Plaintiff Fatemeh Yaghoubi Moghadam is an Iranian national and a lawful permanent resident of the United States.

11. Plaintiff Babak Yaghoubi Moghadam is an Iranian national and a lawful permanent resident of the United States.

12. Plaintiff Ali Sanie is an Iranian national and a lawful permanent resident of the United States.

13. Plaintiff Zahrasdat Mirrazi Renani is an Iranian national with an F-1 student visa.

14. Plaintiff Leily Amirsardary is an Iranian national with an F-1 student visa.

15. Plaintiff Oxfam America, Inc. ("Oxfam") is part of a 19-member confederation of non-governmental development organizations—Oxfam International—dedicated to creating lasting solutions to hunger, poverty, and social

injustice through long-term partnerships with poor communities around the world, and by responding to life-threatening emergencies. Oxfam and all Oxfam International organizations seek to challenge the structural barriers that foster conflict and human suffering and limit people from gaining the skills, resources, and power to become self-sufficient.

16. Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

17. Defendant U.S. Department of Homeland Security ("DHS") is the cabinet department of the United States government responsible for the enforcement of immigration laws.

18. Defendant U.S. Customs and Border Protection ("CBP") is the component of DHS responsible for the protection of the United States border, including the admission of travelers at airports and other ports of entry.

19. Defendant John Kelly is the Secretary of DHS. Secretary Kelly is responsible for the administration of immigration laws at the border and in the interior, and had immediate custody of plaintiff-petitioners Tootkaboni and Louhghalam during their detention on January 27, 2017. He is sued in his official capacity.

20. Defendant Kevin K. McAleenan is the Acting Commissioner of CBP. Acting Commissioner McAleenan is responsible for the administration of immigration laws at the border, including the admission of travelers to the United

States. He had immediate custody of plaintiff-petitioners Tootkaboni and Louhghalam during their detention on January 27, 2017. He is sued in his official capacity.

21. Defendant William Mohalley is the Director of the Boston Field Office of CBP, and had immediate custody of petitioners Tootkaboni and Louhghalam during their detention on January 27, 2017. He is sued in his official capacity.

<strong>STATEMENT OF FACTS</strong>

**I. The Executive Order and Anti-Muslim Sentiment**

**A. The January 27, 2017 Executive Order**

22. Donald Trump was inaugurated as the forty-fifth President of the United States on January 20, 2017.

23. On January 27, President Trump signed an executive order entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States" (herein, "EO").

24. Citing an asserted threat of terrorism committed by foreign nationals, the EO directs a variety of changes to the manner and extent to which non-citizens may seek and obtain entry to the United States. Among other things, the EO imposes a 120-day moratorium on the refugee resettlement program; provides that refugee admissions, once resumed, should prioritize members of a "minority religion" in their countries of origin who are facing "religious-based persecution";

and proclaims that "the entry of nationals of Syria as refugees is detrimental to the interests of the United States," singling out Syrian refugees for an indefinite "suspension" on their admission to the country.

25.     Most relevant here is Section 3(c) of the EO, in which President Trump proclaims "that the immigrant and nonimmigrant entry into the United States of aliens from countries referred to in Section 217(a)(12) of the INA, 8 U.S.C. 1187(a)(12), would be detrimental to the interests of the United States," and that he is therefore "suspend[ing] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order," with narrow exceptions not relevant here.

26.     There are currently seven countries that the United States government has determined fit the criteria in 8 U.S.C. § 1187(a)(12): Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.  According to the terms of the EO, therefore, the "entry into the United States" of non-citizens from those countries is "suspended" for 90 days from the date of the EO.

27.     The impact of this restriction would expand even further if DHS designates additional countries or areas as being "of concern" under 8 U.S.C. § 1187(a)(12)(D); *see id.* § 1187(a)(12)(A), or extends the duration of the ban, either under the terms of the EO itself (see Section 3(e)) or under a new executive order.

### B. The EO's Anti-Muslim Motivation

28. The EO was motivated by anti-Muslim sentiment, not by a desire to further national security or any other legitimate government interest.

29. During his campaign, now-President Trump repeatedly made anti-Muslim statements, including promising to ban Muslims from entering the United States.[2]

30. The EO was designed to implement President's Trump campaign promise to prohibit the entry of Muslims to the United States. In fact, former New York mayor Rudy Giuliani revealed that he assembled a group to develop the EO after President Trump asked him to help him find a "legal[]" way to implement a "Muslim ban."[3]

31. Through its provision favoring refugee admission of religious minorities, the EO also implements President Trump's policy to favor Christians over Muslims from Muslim-majority countries.[4]

---

[2] *See, e.g.*, Donald J. Trump, *Donald J. Trump Statement On Preventing Muslim Immigration* (Dec. 7, 2015), www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration ("Donald J. Trump is calling for a total and complete shutdown of Muslims entering the United States until our country's representatives can figure out what is going on."); Abby Phillip and Abigail Hauslohner, *Trump on the Future of Proposed Muslim Ban, Registry: 'You know my plans'*, Wash. Post (Dec. 22, 2016); *see also* Theodore Schleifer, *Donald Trump: 'I think Islam hates us'*, CNN (Mar. 10, 2016).

[3] *See* Amy B. Wang, *Trump Asked for a 'Muslim ban,' Giuliani says – and Ordered a Commission to do it 'legally'*, Wash. Post (Jan. 29, 2017).

[4] Carol Morello, *Trump Signs Order Temporarily Halting Admission of Refugees, Promises Priority for Christians*, Wash. Post (Jan. 27, 2017) (reporting President Trump affirmed that he would prioritize Middle Eastern Christians). On the morning of January 29, 2017—following orders by three courts enjoining parts of the EO—President Trump tweeted that "Christians in the Middle-East have been

32. In developing the EO, President Trump did not inform or consult officials actually responsible for the nation's defense, homeland security, and control of the nation's borders.[5]

33. Because the EO was motivated by anti-Muslim sentiment rather than any genuine effort to advance national security, or any other legitimate government interest, it is not justified by any facially legitimate and bona fide reason.

## C. Defendants Have not Disavowed Enforcement of the Executive Order

34. On January 29, 2017, this Court granted a temporary restraining order barring for seven days the detention or removal of individuals with valid entry documents under the EO ("TRO"). ECF No. 6. The TRO also ordered CBP to inform airlines flying into Logan Airport that noncitizens would not be detained or removed under the EO.

35. However, later that day, referencing another temporary injunction against the EO issued by United States District Judge Ann M. Donnelly, a White House spokesperson stated that Judge Donnelly's ruling "[did] not undercut the President's executive order. All stopped visas will remain stopped. All halted admissions will remain halted. All restricted travel will remain prohibited."[6]

---

executed in large numbers. We cannot allow this horror to continue!" *See* twitter.com/realdonaldtrup/status/825721153142521858.

[5] *See* Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017) (reporting that Stephen Bannon, chief White House strategist, a small White House team and a small group of the president's advisors worked on order without apprising DHS, the State Department, or the Department of Defense).

[6] Ariane de Vogue, Eli Watkins & Alanne Orjoux, *Judges temporarily block part of Trump's immigration order, WH stands by it*, CNN (Jan. 29, 2017).

36. Also that day, defendants Kelly and DHS issued three separate statements about the EO.

37. In a statement entitled "Department Of Homeland Security Response to Recent Litigation," DHS mirrored the White House stating "prohibited travel will remain prohibited, and the U.S. government retains its right to revoke visas at any time if required for national security or public safety." The release simultaneously stated that it would "continue to enforce all of President Trump's Executive Orders," and that DHS would "comply with judicial orders."[7]

38. That same day, defendant Kelly issued a statement indicating that lawful permanent resident status would be "a dispositive factor in our case-by-case determinations" about the entry and admission of noncitizens into the United States.[8] This statement neither revised the EO nor disclaimed its application to lawful permanent residents.

39. A further statement by DHS that same day stated "[w]e are and will remain in compliance with judicial orders."[9]

40. On January 30, 2017, then-Acting Attorney General Sally Yates directed the Department of Justice not to present arguments in defense of the EO. Yates indicated that her review of the EO included "statements made by [the]

[7] Dep't of Homeland Security, *Department of Homeland Security Response to Recent Litigation*, (Jan 29, 2017), dhs.gov/news/2017/01/29/department-homeland-security-response-recent-litigation.

[8] John Kelly, *Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents into the United States* (Jan. 29, 2017), dhs.gov/news/2017/01/29/statement-secretary-john-kelly-entry-lawful-permanent-residents-united-states.

[9] Dep't of Homeland Security, *DHS Statement on Compliance with Court Orders and the President's Executive Order*, (Jan. 29, 2017), dhs.gov/news/2017/01/29/dhs-statement-compliance-court-orders-and-presidents-executive-order.

administration or its surrogates close in time to the issuance of an Executive Order that may bear on it[s] purpose," and that she was not convinced of the EO's lawfulness.[10]

41.    President Trump fired Yates hours later.[11]

42.    Since this Court's issuance of the TRO on January 29, numerous noncitizens are continuing to be turned away from flights to Logan Airport on the basis of the EO.  Noncitizens who are nationals of the affected countries who are outside the United States do not know whether they will be permitted to travel, and those in the United States have little reason to believe that they will be able to return if they travel abroad.

## II.    Individual Plaintiffs

43.    All of the individual plaintiffs are Iranian nationals who are noncitizens lawfully in the United States after being thoroughly vetted by the United States government.

44.    Plaintiff-petitioners Mazdak Pourabdollah Tootkaboni and Arghavan Louhghalam, and plaintiffs Fatemeh Yaghoubi Moghadam, Babak Yaghoubi Moghadam and Ali Sanie, are lawful permanent residents of the United States.  As lawful permanent residents, they have the right to enter the country unless they are deemed to be seeking admission.  *In re Collado–Munoz*, 21 I&N Dec. 1061, 1065-66 (BIA 1998); *Vartelas v. Holder*, 566 U.S. 257 (2012).  Thus, when Tootkaboni and

---

[10] Jonathan H. Adler, *Acting Attorney General Orders Justice Department Attorneys not to Defend Immigration Executive Order [UPDATED]*, Wash. Post (Jan. 30, 2017).
[11] Michael D. Shear, Mark Landler, Matt Apuzzo & Eric Lichtblau, *Trump Fires Acting Attorney General Who Defied Him*, N.Y. Times (Jan. 30, 2017).

Louhghalam entered the United States on January 28, 2017, they were not seeking admission and had a right to enter the country because they did not relinquish their status as lawful permanent residents, were not absent from the United States for more than 180 days continuously, were not in removal proceedings, did not commit any of the enumerated offenses, and did not attempt to enter the country without inspection. 8 U.S.C. § 1101(a)(13)(C)(i)-(vi) (2014).

45.     Plaintiffs Zahrasdat Mirrazi Renani and Leily Amirsardary hold student F-1 visas, and they were inspected by CBP for lawful entry to the United States.

46.     Student F-1 visas are awarded by the United States government, and approved by a United States Consular Officer. To secure that immigration status, both they and their academic institutions had to be vetted by the United States government.

47.     Congress has provided that Amirsardary and Renani, as nonimmigrant visa-holders, are entitled to enter the United States. Pursuant to 22 C.F.R. § 41.122, an immigration officer may cancel a valid nonimmigrant visa if certain enumerated fraud or inadmissibility criteria are met, none of which are applicable here.[12]

---

[12] Immediately prior to the filing of this Amended Petition, defendants served on the plaintiff-petitioners a document purportedly issued by Edward J. Ramotowski, Deputy Assistant Secretary, Bureau of Consular Affairs, Department of State, dated January 27, 2017 stating "I hereby revoke all valid nonimmigrant and immigrant visas of nationals of Iraq, Iran, Libya, Somalia, Sudan, Syria and Yemen, subject to the exceptions discussed below". This document was never before disclosed to the plaintiffs, nor was it disclosed to this Court at the hearing on

48.    Section 3(c) of the EO prohibits the individual plaintiffs from conducting trips abroad because it declares that their return to the United States would be "detrimental to the interests of the United States" and suspends their rights to re-enter the United States.

49.    If the individual plaintiffs were not Iranian nationals, and instead nationals of any country in the world other than the seven Muslim-majority countries subject to the EO, they still would be legally entitled to conduct travel abroad, knowing that they could return to the United States.

50.    None of the individual plaintiffs poses any threat of terrorist activity and none of them, has any criminal record in Iran or the United States. There is no legitimate government rationale for impeding their international travel or preventing their return to the United States from their scheduled trips abroad. The EO applies to them regardless of whether they travel to a country that may have sensitive diplomatic relations with the United States or whether they travel to a close ally of the United States.

51.    Enforcement of the EO has caused, and will continue to cause, irreparable and significant harm to the individual plaintiffs, as alleged below.

---

January 28-29, 2017.  Plaintiffs reserve their right to further amend this Amended Petition once the purported action of the Assistant Secretary has been investigated.

## Plaintiff-Petitioner Arghavan Louhghalam

52.     Plaintiff-petitioner Arghavan Louhghalam is an Iranian national and a lawful permanent resident of the United States who resides in Massachusetts.

53.     Louhghalam is Muslim.

54.     Louhghalam holds a Ph.D. and an M.S. in Engineering Mechanics from the Johns Hopkins University. She is now an Assistant Professor at the University of Massachusetts Dartmouth.

55.     Louhghalam arrived at Logan Airport on January 28, 2017, following a trip out of the country to attend an academic conference.  She was detained for nearly four hours, suffering irreparable harm.

56.     This petition was filed and she was released prior to a hearing on the habeas petition.

57.     The defendants' enforcement of the EO was the only reason for Louhghalam's detention.

58.     As an academic, Louhghalam must travel internationally for work to attend meetings and conferences.  It is also important to her to visit her father in Iran on a regular basis, because he is 69 years old and has a serious heart condition.

59.     As a consequence of the EO, Louhghalam is now refraining from leaving the country because she is afraid she will be unable to return.

## Plaintiff-Petitioner Mazdak Pourabdollah Tootkaboni

60.    Plaintiff-petitioner Mazdak Pourabdollah Tootkaboni is an Iranian national and a lawful permanent resident of the United States who resides in Massachusetts.  He is married to Louhghalam.

61.    Tootkaboni is Muslim.

62.    Tootkaboni joined the Department of Civil Engineering at the Johns Hopkins University in 2004 and earned his Ph.D. in Structural Mechanics in May 2009.  He is now an Associate Professor at the University of Massachusetts Dartmouth.

63.    Tootkaboni arrived at Logan Airport on January 28, 2017, following a trip out of the country to attend an academic conference.  He was detained for nearly four hours, suffering irreparable harm.

64.    This petition was filed and he was released prior to a hearing on the habeas petition.

65.    The defendants' enforcement of the EO was the only reason for Tootkaboni's detention.

66.    As an academic, Tootkabani must travel internationally for work to attend meetings and conferences.  It is also important to him to visit his mother in Iran on a regular basis, because she is 70 years old and has suffered from serious depression for about 25 years.

67.     As a consequence of the EO, Tootkabani is now refraining from leaving the country because he is afraid he will be unable to return.

**Plaintiff Fatemeh Yaghoubi Moghadam**

68.     Plaintiff Fatemeh Yaghoubi Moghadam ("F. Moghadam") is an Iranian national and a lawful permanent resident of the United States who resides in Massachusetts with her brother, Babak. She has a bachelor's degree in graphic design.

69.     She is Muslim.

70.     F. Moghadam has close family members living in Iran, including her parents, a brother, a grandmother with whom she is very close, and aunts and uncles on her mother's side of the family. She misses her family very much and had counted on visiting them this spring, especially her brother Behrouz who recently suffered a major heart attack.

71.     F. Moghadam fears that due to the EO she will not be able to return to the United States if she travels abroad to visit family in Iran.

72.     As a consequence of the EO, F. Moghadan is now refraining from traveling to Iran to see her family, because she is afraid that she will be unable to return.

### Plaintiff Babak Yaghoubi Moghadam

73.    Plaintiff Babak Yaghoubi Moghadam ("B. Moghadam") is an Iranian national and a lawful permanent resident of the United States who resides in Massachusetts. He is the brother of Fatemeh.

74.    He is Muslim.

75.    He has a Ph.D. in mechanical engineering from the University of Washington, an M.S. degree in mechanical engineering from Ferdowsi University and a B.S. in mechanical engineering from Iran University of Science & Technology.

76.    B. Moghadam obtained his permanent resident status through a national interest waiver based on the importance to the United States of his knowledge, skills and experience.  He currently is employed as a senior engineer by Becton Dickinson, a global medical technology company, and works on making medical devices to treat type I and type II diabetes patients.  He also has experience developing ten-to-fifteen minute diagnostic tests to be used in doctors' offices, saving patients the need to go to hospitals for tests for diseases like HIV.

77.    B. Moghadam has close family members living in Iran, including his parents, a brother, a grandmother, and aunts and uncles on his mother's side of the family.

78.    B. Moghadam had been planning to purchase a ticket to visit these relatives in Iran or in other nearby countries in the next month.  He particularly needs to see his brother Behrouz, who recently suffered a major heart attack.

79.     In addition, to advance at his company, B. Moghadam must be able to travel internationally.  His employer, however, has advised non-citizen employees from Iran and the other affected countries not to travel abroad because of the EO.

80.     As a consequence of the EO, B. Moghadan is now refraining from traveling abroad to see his family and advance his career, because he is afraid he will be unable to return.

**Plaintiff Ali Sanie**

81.     Plaintiff Ali Sanie is an Iranian citizen and a lawful permanent resident residing in Massachusetts.

82.     Sanie is Muslim.

83.     Sanie works as a cashier at a grocery store seven days a week.  He developed serious neck issues that cause intense pain in his neck, and potentially requires neck surgery.

84.     Sanie's medical doctor in Iran is best suited to perform any required surgery, and Sanie's family in Iran is able to care for him during his recovery after any surgery.

85.     Accordingly, Sanie made plans to travel to Iran to obtain medical treatment from his own physician and scheduled his departure for Iran on January 30, 2017, with plans to complete his surgery before March 20, 2017.

86.     Sanie made arrangements for his trip by pre-paying three months of his rent, and arranging with his employer to have coverage for his job while he was gone.  Sanie funded his round-trip travel with two years of savings.

87.     Sanie is very upset because of his inability to receive medical care in Iran and is confused about what his future will hold.

88.     Sanie is in intense pain, is disabled as a result of his injury, and his position has been filled for the next three months.

89.     As a consequence of the EO, Sanie did not travel on January 30 as scheduled. He is refraining from traveling to Iran to receive critical medical care from his physician, and to be cared for by his family, because he is afraid he will be unable to return to the United States.

**Plaintiff Zahrasadat Mirrazi Renani**

90.     Plaintiff Zahrasadat Mirrazi Renani is an Iranian national and a lawful non-immigrant residing in Massachusetts.

91.     Renani is Muslim.

92.     She is currently completing her first year of a five-year doctoral program in linguistics at University of Massachusetts Amherst.  Her linguistics program is ranked seventh in the world of over 3000 universities evaluated by QS World University Rankings.  Her academic focus is in syntax and semantics.  She earned straight As in her first semester.

93.     Renani's parents, a teacher and a businessman, live in Iran.  Her only sibling, a younger brother, died just eight months ago of a stroke while mountain climbing.

94.     Renani chose to study in America despite achieving the highest score of 3000 students on the annual examination for admission into postgraduate linguistics programs in Iran.  She promised, however, to visit her parents often, and obtained a multiple entry F-1 visa before moving to the United States in September 2016.

95.     Renani made her first visit to her parents on December 14, 2016.  She spent her entire winter break with her family, returning to the University of Massachusetts Amherst on January 21, 2017.

96.     Renani had planned to visit her parents again in late March during on Norooz, a time of New Year observance in Iranian culture, when families traditionally come together to reflect and celebrate.  Renani and her parents are still reckoning with her brother's tragic death, so reuniting to comfort one another and their extended family is uniquely important this year.  Renani had planned to leave for Iran on March 11, 2017, the day her spring break begins.

97.     Renani also had planned to attend the West Coast Conference on Formal Linguistics in Calgary Canada, and to arrive there on April 27, 2017.  This conference is among the most prestigious in Renani's field of research.  She has researched, drafted and submitted an abstract for presentation at the conference, on "Double-Object Construction in the Persian Language."  The opportunity to present

to such an accomplished audience would be an invaluable step forward in Renani's young but promising academic career.

98. As a consequence of the EO, however, Renani is refraining from international travel because she is afraid she will be unable to return.

99. If she makes either of her planned trips abroad—each scheduled for an irreplaceably important period which falls within 90 days of the EO—she is afraid she will not be able to return to the United States.

100. Renani has been awarded full funding of her doctoral studies—worth over $290,000—but that funding is conditioned upon her continued fulfillment of class requirements and the teaching and research responsibilities of an "Assistantship" which she holds at the University of Amherst. The EO therefore imposes an unfair and indefensible predicament: Renani must forfeit two invaluable opportunities for family reunion and professional growth; or she must forfeit the opportunity she has earned to pursue her doctorate in formal linguistics.

**Plaintiff Leily Amirsardary**

101. Plaintiff Leily Amirsardary is an Iranian national and a lawful non-immigrant residing in Massachusetts. She owns a small business.

102. Amirsardary was born in Iran and attended high school in France, where she is a resident. She attended Wellesley College in Massachusetts on an F-1 student visa, and graduated from Wellesley with a bachelor's degree in 2016.

103. Amirsardary obtained Optional Practical Training ("OPT") in July 2016 through U.S. Citizenship and Immigration Services.

104.    In 2016, Amirsardary founded Anara, a Boston-based women's luxury footwear startup company that produces shoes and regionally-inspired accessories. Anara is hoping to launch its first line of products in June 2017.

105.    Anara is funded by U.S and foreign investors, and will soon join a university affiliated incubator, the Harvard Innovation Lab.  In addition, Anara currently receives some operational support from Harvard Business School students.  The company is on track to raise a convertible note from angel investors and venture capital groups.  Several United States-based angel investors have already committed to investing, and investment will begin in the coming weeks.

106.    Once successfully launched, Anara will hire its own employees. Currently, however, Amirsardary is solely responsible for nearly every aspect of Anara's operations, ranging from designing the products to raising capital for the company.

107.    Amirsardary has worked tirelessly to build Anara, and the company is a few short months from being able to launch its products.

108.    Anara's test products (currently limited to footwear) are manufactured in Italy.  It is crucial that Amirsadary travel to Italy every six to eight weeks to source materials for Anara and oversee its manufacturing process.  Before the EO, Amirsardary was legally entitled to, and did, travel from the United States to and from Italy to conduct business for Anara.  She last traveled there in November 2016, and she must travel again to Italy to source materials and oversee the manufacturing process for Anara no later than March, 2017.

109. Anara's business plan also includes sourcing materials from and working with manufacturers from Spain, India and Thailand. Prior to launching these types of products, it is crucial that Amirsardary be able to travel to other destinations to source these products and accessories.

110. Amirsardary's regular travel to outside of the United States, and her right to return to the United States after her travel, is crucial to the success of her small business Anara.

111. As a consequence of the EO, however, Amrisardy is refraining from traveling abroad because she is afraid she will be unable to return.

## III. Oxfam America

112. Oxfam America is a non-profit headquartered in Boston.

113. Oxfam and its affiliated organizations fund development and humanitarian relief projects in more than 90 countries, collaborating on strategic, long-term efforts to help build strong local organizations that can promote self-sufficiency and alleviate the issues of global poverty. Oxfam and its affiliates advocate for changes in international policies related to trade, conflict, funding for education, development assistance, debt relief and other issues, as well as work to educate and mobilize the public and raise awareness about global poverty.

114. Oxfam operates in five of the seven countries affected by the Executive Order—all but Libya and Iran. Its humanitarian mission is crucial in those countries; for example, Oxfam is one of the few international non-governmental

organizations still allowed to function in Sudan, bringing much-needed relief to displaced populations in Darfur and beyond.

115.   Oxfam regularly brings staff members and civil society partners from the affected countries to the United States.  These visits are essential for internal purposes, so that Oxfam's American staff can obtain information from their overseas colleagues that enable the organization to carry out its activities in the United States.  They are critical for external purposes as well, as they provide opportunities for people who are intimately familiar with country conditions to bear witness on Oxfam's behalf in direct communications with members of the organization's key American constituencies.  This includes speaking to key Congressional constituencies, donors, and potential donors about conditions, and about Oxfam's operations, in those countries, and these efforts are essential for keeping Oxfam's programs in those countries funded and operational.

116.   In addition, Oxfam regularly brings people from the affected countries to the United States to speak with American governmental officials, including lawmakers in the United States' House of Representatives and Senate and members of the executive branch (including representatives of the White House, the Department of State, and the Department of the Treasury) as well as the United Nations' Security Council mission in New York.  These meetings and discussions enable Oxfam to educate governmental officials generally about political and humanitarian conditions in the affected countries, and also to answer specific

questions helpful in shaping policy and practice with respect to countries where the United States government often has limited insight because of ongoing conflict.

117.    Oxfam frequently brings representatives from the affected countries to the United States for this purpose at the request of the governmental officials themselves.  For example, just prior to the signing of the Executive Order, Oxfam was requested to send its Country Director from one of the listed countries to Washington to provide briefings on a key, time-sensitive issue under consideration across the White House, the Department of the Treasury, and the Department of State.  The meeting was to be held within the 90-day period of the visa ban in order to comply with the United States Government's own timeline for action, but that meeting will now be impossible.

118.    Oxfam currently expects to bring several other people to the United States from the affected countries within the next 90 days.  This includes a representative of a partner organization in Syria, who has been invited to speak at public events in mid-March marking six years since the start of the Syria crisis, to raise awareness and suggest potential solutions to government officials, the media, and the public.  Much of this analysis comes from inside besieged areas of Syria where information is extremely difficult to come by and can only be provided securely in person in the United States.  Another major component of these meetings surrounds ongoing discussions with Congress and the Department of the Treasury on the exclusion of a growing number of civil society organizations from financial services needed to deliver life-saving aid in Syria.

119. Many people who bear witness on Oxfam's behalf about their experiences and conditions in their countries must come to the United States to do so because they cannot safely or legally speak publicly at home.

120. Application of the EO will therefore severely impair Oxfam's ability to advocate on its behalf and on behalf of the people Oxfam assists in the developing world. The EO will also prevent Oxfam and its representatives from addressing members of Oxfam's key Executive and Congressional constituencies and responding to specific inquiries made by them, therefore impacting the federal government's ability to properly effectuate foreign policy and programs in areas directly affected by Oxfam's work.

121. Enforcement of the EO has caused, and will continue to cause, Oxfam injury in fact by, among other things, causing administrative and logistical burdens; depriving Oxfam's employees and affiliates of their protected ability to speak with key governmental constituencies to advocate for and address questions regarding Oxfam's programs in the affected countries; depriving Oxfam of its ability to utilize its representatives on specific projects in the furtherance of Oxfam's fundraising needs; preventing Oxfam from representing the interests and intent of its American donors; and frustrating Oxfam's organizational mission of alleviating global poverty. Moreover, if the EO is enforced, Oxfam will be irreparably injured by the infringement of its rights under the First Amendment to speak freely, associate freely, and petition the government. The Court can redress these injuries by

declaring the EO is unconstitutional and invalid, and by enjoining its further enforcement.

## CAUSES OF ACTION

## COUNT ONE
## FIFTH AMENDMENT – EQUAL PROTECTION

122. The foregoing allegations are realleged and incorporated herein.

123. The Fifth Amendment's Equal Protection Clause prohibits classifications on the basis of religion—including laws or policies enacted with discriminatory intent or applied in a discriminatory manner—unless narrowly tailored to serve a compelling government interest. *Larson v. Valente*, 456 U.S. 228, 244, 246 (1982); *Anderson ex rel. Dowd v. City of Boston*, 375 F.3d 71, 82-83 (1st Cir. 2004) (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977)); *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995).

124. The EO discriminates on the basis of religion and directs the discriminatory application of immigration laws.

125. The EO is also motivated by animus against Muslims and was designed to target Muslims for exclusion from the United States.

126. The Equal Protection Clause also limits classifications based on national origin.

127. The EO singles out for differential treatment individuals from seven countries.

128. This disparate treatment is not narrowly tailored to serve a compelling interest. Indeed, it does not further any legitimate government interest. Consequently, the EO violates the individual plaintiffs' equal protection right to be free from religious and national origin discrimination.

## COUNT TWO
## FIRST AMENDMENT – ESTABLISHMENT CLAUSE

129. The foregoing allegations are realleged and incorporated herein.

130. The First Amendment's Establishment Clause erects "a wall of separation between church and State." *Everson v. Bd. of Educ.*, 330 U.S. 1, 15-16 (1947) (quotation marks omitted). Its "clearest command" is "that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. This prohibits government action that discriminates among religions unless such action is narrowly tailored to serve a compelling government interest. *Id.* at 246-47, 254-55; *Awad v. Ziriax*, 670 F.3d 1111, 1130-31 (10th Cir. 2012).

131. As described above, the EO preferences Christianity and disfavors Islam. This discriminatory treatment is not narrowly tailored to serve a compelling interest. Indeed, it does not further any legitimate government interest. Consequently, the EO violates the Establishment Clause of the First Amendment.

## COUNT THREE
## FIFTH AMENDMENT – DUE PROCESS

132. The foregoing allegations are realleged and incorporated herein.

133. All non-citizens entering the United States are entitled to the protections of the Due Process Clause of the Fifth Amendment. *See, e.g.*, *Dia v. Ashcroft*, 353 F.3d 228, 239 (3d Cir. 2003) (arriving non-citizens must be afforded those statutory rights granted by Congress and "[m]inimum due process rights attach to statutory rights"); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (affirming particularly significant due process rights of lawful permanent residents re-entering the United States).

134. Because the EO prohibits the individual plaintiffs from entering the United States without affording even minimal procedural safeguards, it violates the due process rights guaranteed by the Fifth Amendment.

## COUNT FOUR
## ADMINISTRATIVE PROCEDURE ACT

135. The foregoing allegations are realleged and incorporated herein.

136. The APA prohibits actions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A); contrary to constitutional right, power, privilege, or immunity, *id*. at § 706(2)(B); in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, *id*. at § 706(2)(C); or without observance of procedure required by law, *id*. at § 706(2)(D).

137. The EO violates the APA because it discriminates based on religion and national origin, preferences Christianity over other religions and exhibits hostility to Islam, violates the INA's non-discrimination clause, 8 U.S.C.

§ 1152(a)(1)(A), and prevents individuals from exercising their opportunity to apply for asylum, withholding of removal, and Convention Against Torture relief, guaranteed by immigration laws. *See* 8 U.S.C. § 1225(b)(1), 8 C.F.R. §§ 235.3(b)(4), 208.30, 1003.42; 8 U.S.C. § 1158 (asylum); 8 U.S.C. § 1231(b)(3); Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified at 8 U.S.C. § 1231 note).

## COUNT FIVE
## FIRST AMENDMENT – FREE SPEECH, FREE ASSOCIATION AND PETITIONING CLAUSES

138.    The foregoing allegations are realleged and incorporated herein.

139.    The First Amendment protects the right "to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (quotation omitted). This includes to the right to "hear, speak, and debate with" non-immigrants and lawful permanent residents. *American Academy of Religion v. Napolitano*, 573 F.3d 115, 117 (2d Cir. 2009) (quotation marks omitted); *American Sociological Ass'n v. Chertoff*, 588 F. Supp. 2d 166, 169 (D. Mass 2008).

140.    The preservation of this right is particularly important for academic, research, and policy organizations, whose very missions require a robust exchange of ideas among diverse groups of people.

141.    The First Amendment also protects "the right to petition the government for redress of grievances." U.S. CONST. Amend. I.

142. As described above, the EO significantly burdens Oxfam's First Amendment rights, but it is neither substantially related to an important government interest, nor narrowly tailored to a compelling government interest. Indeed, the EO is not even justified by any facially legitimate and bona fide reason.

143. Defendants' enforcement of the EO and exclusion of Oxfam's employees and affiliates residing and working in the affected countries, violates the free speech, free association and petitioning rights of Oxfam, its employees, and affiliated representatives and professionals.

## PRAYER FOR RELIEF

**WHEREFORE**, all plaintiffs seek an order and judgment:

(1) issuing a Writ of Habeas Corpus requiring defendants to release plaintiff-petitioners;

(2) declaring that Section 3 of the EO is unlawful and unconstitutional;

(3) permanently enjoining defendants from detaining or removing any individual solely based on the EO;

(4) requiring defendants to communicate to all airlines flying into the United States that this Court has declared Section 3 unlawful and unconstitutional, and that defendants have been prohibited by this Court from relying on the EO as a basis to detain or remove anyone otherwise legally authorized to enter the United States;

(5)     awarding plaintiffs reasonable costs and attorney's fees; and

(6)     granting any other relief that this Court may deem fit and proper.

Respectfully submitted,

| | |
|---|---|
| /s/ Susan Church | /s/ Kerry E. Doyle |
| Susan Church (BBO #639306) | Kerry E. Doyle (BBO #565648) |
| Derege Demissie (BBO #637544) | GRAVES & DOYLE |
| Heather Yountz (BBO # 669770) | 100 State Street, 9th Floor |
| DEMISSIE & CHURCH | Boston, MA 02109 |
| 929 Mass. Ave., Suite 1 | (617) 216-1248 |
| Cambridge, MA 02139 | |
| (617) 354-3944 | |
| | |
| /s/ Michael S. Gardener | /s/ Matthew R. Segal |
| Michael S. Gardener (BBO #185040) | Matthew R. Segal (BBO #654489) |
| Elizabeth B. Burnett (BBO #066120) | Sarah Wunsch (BBO #548767) |
| Peter A. Biagetti (BBO #042310) | Jessie J. Rossman (BBO #670685) |
| Susan M. Finegan (BBO #559156) | Laura Rotolo (BBO #665247) |
| Andrew N. Nathanson (BBO #548684) | Adriana Lafaille (BBO #680210) |
| Susan J. Cohen (BBO #546482) | ACLU FOUNDATION OF MASSACHUSETTS |
| MINTZ, LEVIN, COHN, FERRIS, GLOVSKY | 211 Congress Street |
| AND POPEO, P.C. | Boston, MA 02110 |
| One Financial Center | (617) 482-3170 |
| Boston, MA 02111 | msegal@aclum.org |
| (617) 542-6000 | |
| smfinegan@mintz.com | |

Date: February 1, 2017

## CERTIFICATE OF SERVICE

    I, Matthew R. Segal, hereby certify that the foregoing document will be filed through the ECF system on February 1, 2017, which will cause counsel for all parties to be electronically served.

Respectfully submitted,

/s/ Matthew R. Segal
Matthew R. Segal