UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

ARGHAVAN LOUHGHALAM and
MAZDAK POURABDOLLAH TOOTKABONI
*Plaintiff-Petitioners,*

FATEMEH YAGHOUBI MOGHADAM,
BABAK YAGHOUBI MOGHADAM,
ALI SANIE, ZAHRASADAT MIRRAZI
RENANI, LEILY AMIRSARDARY, and
OXFAM AMERICA, INC.
*Plaintiffs,*

and

COMMONWEALTH OF MASSACHUSETTS
and UNIVERSITY OF MASSACHUSETTS,
*Plaintiff-Intervenors,*

v.

DONALD TRUMP, President of the United
States; U.S. DEPARTMENT OF HOMELAND
SECURITY ("DHS"); U.S. CUSTOMS AND
BORDER PROTECTION ("CBP"); JOHN
KELLY, Secretary of DHS; KEVIN K.
MCALEENAN, Acting Commissioner of CBP;
and WILLIAM MOHALLEY, Boston Field
Director, CBP,
*Defendants.*

No.17.cv-10154-NMG

**CITY OF BOSTON'S DECLARATION OF
IMMEDIATE AND IRREPARABLE HARM**

I, Alejandra St. Guillen, hereby declare and affirm,

1. I am the Director of the City of Boston Mayor's Office for Immigrant Advancement (the "Office"), which is located at One City Hall Square, Room 806 in Boston, Massachusetts. I have been employed at the City of Boston in this capacity since February 2014.

2. As Director of the Mayor's Office for Immigrant Advancement, I oversee all of the Office's programming, including immigrant community outreach and engagement, policy development, interdepartmental collaboration, immigrant and non-English-speakers' access to City of Boston services, advocacy, internal resource development, and the administration and finances of the Office.

3. I have reviewed the January 27, 2017, Executive Order entitled "Protecting the Nation From Terrorist Entry into the United States" and the filings made by the Office of the Attorney General.

4. I have personal knowledge of the matters set forth below. My Office co-sponsored a study by the Boston Redevelopment Authority d/b/a the Boston Planning and Development Agency analyzing the impact of the foreign-born population in the City of Boston and the positive economic and societal impacts immigrants have had on the City of Boston and its neighborhoods. I state and affirm that I have reviewed the study and spoken to other public officials of the City of Boston; namely, the Mayor's Office of Immigrant Advancement's Policy and Communications Advisor, An Le, the City of Boston Chief of Economic Development, John Barros, and employees in the Office for Immigrant Advancement conducting constituent intakes.

5. The City of Boston has a long history as a point of entry for individuals and families moving to the United States.

6. Communications to my Office, by electronic mail and phone, from immigrant-constituents suggest that the language of the Executive Order and President Donald Trump's Administration's implementation of the Executive Order have sowed confusion into the immigrant community of the City of Boston. The Trump Administration's inconsistent implementation of the Executive Order has harmed the City's ability to provide critical

constituent services. As a result, my office has been unable to adequately respond to and direct members of our immigrant community who are from the affected countries, who have plans to travel outside of the United States, and/or are awaiting the arrival of relatives from the affected countries and otherwise.

7. Due to the inconsistent implementation of the Executive Order, non-citizen constituents, both from the affected countries and otherwise, have informed the Office of their fear to travel to and from the City of Boston, signaling the Executive Order's implementation has and will continue to have a chilling effect on all immigrants and non-immigrants coming to the City of Boston.

8. The following are only some examples of constituent communications I received evidencing constituent fear and confusion regarding the Executive Order:

    a. My office received a call from a constituent whose mother travelling with an IR-5 immigrant visa was rerouted to Vancouver, Canada at London's Heathrow Airport where customs officials have prohibited her from traveling to the United States. The constituent contacted customs officials in Canada who, as a result of the Executive Order, will not allow his mother to board a plane to the United States.

    b. Two Iranian sisters planning to apply for permanent residency are fearful that the naming of their home country of Iran will derail their efforts to apply for and become permanent residents of the City of Boston. These women are local professional artists. Since receiving Master's Degrees from local educational institutions, they have made great contributions to the artistic and cultural landscape of the City of Boston, including

performances at the Boston Center for the Arts and the Adelson galleries. Their work has been recognized and reviewed in two popular local publications.

c. After the issuance of the Executive Order, a Massachusetts resident who is in the country as a result of an application for legal asylum contacted the Office because he was uncertain of the status of his family's visas. He informed me that he had applied to have his wife, two sons, and daughter join him in Massachusetts from Islamabad, Pakistan. Upon his application in February 2016, he was told that his wife and children's visas had been approved and would be issued within six months. His wife sold their home in Islamabad, Pakistan under the belief that the visas would issue and that she would be able to join her husband in Massachusetts.

d. A constituent came to the City of Boston in 2014 from his home country of Libya to pursue graduate education in one of the City's educational institutions. In his communication to the Office, he explained how he felt respected upon arrival in Boston and found the City of Boston to be warm, welcoming, and safe. He is seeking asylum in the City of Boston because he believes Libya is a dangerous place for him to live. After obtaining two graduate degrees since 2014, he is now employed by one of Boston's large, national banks. He is concerned that as a result of the Executive Order, his asylum application will be rejected. He contacted the Office seeking advice and asking if he could assist the Office or the City of Boston in any way.

  e. One constituent contacted the Office concerned for her Syrian parents in Boston, who are green card holders, and have travel plans in February to travel to Lebanon and Syria. The constituent asked the Office to provide guidance on whether they should cancel their travel plans, and if they did not, asking whether they would have any issues coming back into Boston.

  f. One constituent came into City Hall and asked whether she should cancel her travel plans to Morocco this month. She is a legal permanent resident, but due to the inconsistent statements made regarding the Executive Order, she is unsure whether she will be allowed back in the United States after she leaves.

  g. My office received a call from an attorney representing a married couple traveling to Boston from Beirut, Lebanon. The husband is Syrian and his wife is a United States citizen. He applied for a green card in 2015, and his conditional residence was approved in November 2016. They are traveling to the United States together to establish permanent residency, but the husband has been informed that he will not be permitted to travel to the United States.

9. The City of Boston relies both economically and socially on its foreign-born population and the free movement of tourists from all parts of the world. The City of Boston's foreign-born population accounts for thirty-seven (37) percent of the City of Boston's overall growth. A significant component of the growth attributed to foreign-born populations comes from Africa, where our African foreign-born population increased by fifty-five (55) percent.

Somalia, which is listed as an affected country, was the fourth largest contributor from Africa to the City of Boston's growth in foreign-born population.

10. In Boston, forty-eight (48) percent of children are born to at least one foreign-born parent.

11. Immigrants contribute largely to the City of Boston's higher education prowess, making up twenty-two (22) percent of the undergraduate and graduate students living in Boston.

12. Immigrants contribute to the City of Boston's economic productivity, making up thirty (30) percent of the City of Boston's resident labor force and owning one-third (1/3) of Boston-resident-owned businesses. These immigrant-owned businesses employ approximately 18,000 workers in the City of Boston and the Commonwealth of Massachusetts.

13. Relatedly, according to a 2014 article, *The Somali Diaspora in Greater Boston*, written by authors Paul R. Camacho, Abdi Dirshe, Mohamoud Hiray and Mohamed J. Farah, Somalis in Boston own approximately two dozen small businesses in Boston, with the majority of those businesses located in minority communities. The immigrants from Somalia, an affected country, along with other foreign-born small business owners, have revitalized minority neighborhoods and restored abandoned storefronts, and brought important economic development in East Boston, Dorchester, Roxbury, and Mattapan.

14. Of great concern to the City of Boston is the Executive Order's chilling effect, which, as demonstrated by constituent e-mails, has already had a lasting impact on foreign individuals' decisions to travel to the City of Boston. The City of Boston relies on its global tourism industry. In 2015, the City of Boston benefitted from approximately 1.6 million overseas visitors, who spent over one billion dollars in the City of Boston's local economy.

15. In addition to the Executive Order's chilling effect on the decision to visit the City of Boston as a tourist, the City of Boston risks losing taxable revenue contributed by immigrants residing in the City of Boston. In 2014, the foreign-born population's expenditures in the City of Boston equaled approximately 3.5 billion dollars, which generated 116.1 million dollars in local and state taxes.

16. In addition to the immediate harm to the City of Boston's local economy by stymying the flow of immigrants and overseas visitors into the City of Boston, the Executive Order prevents the City of Boston, as an entity, from implementing its obligations under existing international agreements and precludes the City of Boston from engaging in the exchange of ideas with international partners and governments.

17. On February 10, 2016, the City of Boston entered into a Memorandum of Understanding (the "Agreement") with the City of Lyon in France with the express purpose of promoting cooperation among the two communities to further the objective of sustainable, urban development, and focusing on economic, social, cultural, and environmental matters. Part of the Agreement was to strategically cooperate in the development of important economic sectors to both cities, including biotechnology, sustainable energy systems, robotics, and security. One collaborative effort resulting from this Agreement has been the Big Booster accelerator program, created by Cities of Lyon and Boston, for start-ups promoting innovation in biotechnology, information technology, and global impact. The competition is currently one of the largest in Europe for early-stage startups and draws its participants from Europe, the Middle East, and Africa. All seven of the affected countries are in the Middle East and Africa, and the Executive Order threatens the City of Boston's continued participation in the program, the program's vitality, and the City of Boston's standing as a renowned innovation ecosystem.

18. The City of Boston and the Mayor's Office for Immigrant Advancement has an unwavering commitment to diversity in our neighborhoods and the global exchange of ideas, which bring demonstrated economic and social prosperity to the City of Boston. The absence of overseas visitors and the deterioration of the foreign-born population in the City of Boston threaten the City of Boston's economy and workforce, the continued excellence of the City's educational institutions, tax revenue, and the City's reputation as a global leader in innovation.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Alejandra St. Guillen

Executed this 2nd day of February, 2017