United States District Court
District of Massachusetts

```
_____
                               )
Arghavan Louhghalam et al.     )
                               )
        Plaintiffs,            )
                               )
        v.                     )      Civil Action No.
                               )      17-10154-NMG
Donald J. Trump, President of  )
the United States, et al.      )
                               )
        Defendants.            )
_____)
```

MEMORANDUM & ORDER

GORTON, J.

This Court was initially asked 1) to issue a writ of habeas corpus on behalf of by Arghavan Louhghalam and Mazdak Pourabdollah Tootkaboni, lawful permanent residents who were detained at Boston Logan International Airport ("Logan") for several hours upon arrival from an academic conference outside the United States and 2) to declare unlawful Executive Order 13,769, promulgated by the President of the United States.

Late in the evening on January 28, 2017, United States District Judge Allison D. Burroughs and United States Magistrate Judge Judith G. Dein held a hearing on a motion of Louhghalam and Tootkaboni for a temporary restraining order.  Following that hearing, Judge Burroughs and Magistrate Judge Dein entered a temporary restraining order ("TRO") that, inter alia, prohibits the detention and/or removal of individuals with

approved refugee applications who would be legally admitted to the United States in absence of the Executive Order.  That TRO is set to expire on Sunday, February 5, 2017.

Following entry of the TRO a flurry of activity has resulted in the filing of an amended complaint wherein five other Iranian nationals and Oxfam America, Inc. are named as additional plaintiffs and the allowance of a motion by the Commonwealth of Massachusetts and the University of Massachusetts to intervene as plaintiffs.  Now pending before this session is the informal motion of all of the plaintiffs to continue in force the subject TRO which defendant opposes.  Oral argument on that motion was heard earlier today.

I.   **Background**

A.   **The Parties**

Habeas petitioners Tootkaboni and Louhghalam are Iranian nationals, Muslim and lawful permanent residents of the United States.  Both are currently employed as Associate Professors at the University of Massachusetts-Dartmouth.  They were each detained for nearly four hours at Logan Airport on January 28, 2017, without access to counsel, after returning from an academic conference outside the country.

The five other individual plaintiffs are Iranian nationals and Muslim.  Three of them, Babak Yaghoubi Moghadam, his sister, Fatemeh Yaghoubi Moghadam, and Ali Sanie are also lawful

permanent residents.  Plaintiffs Zahrasadat Mirrazi Renani and Leily Amirsardary are in the United States on valid F-1 student visas.  Plaintiff Oxfam America Inc. is a subsidiary of a world-wide non-profit organization that promotes policy reform in the United States and abroad with respect to global poverty.

Defendants in this case are President of the United States, Donald J. Trump, United States Customs and Border Protection ("CBP"), Kevin K. McAleen, the Acting Commissioner of the CBP, William Mohalley, the Boston Field Director of the CPB, and the Department of Homeland Security and its Secretary, John Kelly. Each individual defendant is sued in his official capacity.

**B.    The Executive Order**

On January 27, 2017, the President of the United States Donald J. Trump, issued Executive Order No. 13,769 entitled "Protecting the Nation from Foreign Terrorist Entry into the United States" ("EO").  The EO directs changes to the policy and process of admitting non-citizens into the United States purportedly to protect national security and to provide a period of review for relevant agencies to evaluate current procedures and to propose and implement new procedures.

The changes in immigration procedure relevant to this action are as follows.  The EO suspends for 90 days entry of immigrants and non-immigrants from seven countries:  Iraq, Iran, Libya, Somalia, Sudan, Syria and Yemen. Exec. Order 13,769

§ 3(c).  The EO also suspends, for 120 days, the United States

Refugee Admission Program ("USRAP").  Id. § 5(b).  The order

directs, after the suspension on USRAP ends, that the Secretary

of State prioritize applicants on the basis of religious-based

persecution

> provided that the religion of the individual is a minority
> religion in the individual's country of nationality.

Id.

On February 1, 2017, White House counsel issued a

clarification to the Acting Secretary of State, the Attorney

General and the Secretary of Homeland Security that Sections

3(c) and 3(e) do not apply to lawful permanent residents.

### C.    The Immigration and Nationality Act

The Immigration and Nationality Act ("INA"), 8 U.S.C.

§ 1101 et seq., was originally enacted in 1952 and has been

amended several times, including in 1996 by the Illegal

Immigration Reform and Immigrant Responsibility Act ("IIRIRA").

The INA governs immigration, naturalization, refugee assistance

and removal procedures and defines the circumstances that govern

the admission of aliens into the United States.

The relevant provision of the INA provides that:

> Whenever the President finds that the entry of any aliens
> or of any class of aliens into the United States would be
> detrimental to the interests of the United States, he may
> by proclamation, and for such period as he shall deem
> necessary, suspend the entry of all aliens or any class of
> aliens as immigrants or nonimmigrants, or impose on the

entry of aliens any restrictions he may deem to be
appropriate.

8 U.S.C. § 1182(f).

### D.   Procedural History

As described above, petitioners Tootkaboni and Louhghalam
filed a writ of habeas corpus on January 28, 2017.  In the
middle of a weekend night, following a hearing, Judge Burroughs
and Magistrate Judge Dein, the assigned emergency district and
magistrate judges, respectively, entered a TRO preventing
individuals subject to the EO from being detained or removed
upon arrival at Logan.  The TRO also directed petitioners to
file an amended complaint and scheduled a hearing to occur prior
to the expiration of that order.  The matter was randomly
assigned to this judicial officer who, accordingly, scheduled a
hearing with respect to the continuance of the TRO.

## II.  <u>Continuance of the TRO</u>

### A.   Legal Standard

In order to obtain a preliminary injunction or temporary
restraining order, the moving party must establish 1) a
reasonable likelihood of success on the merits, 2) the potential
for irreparable harm if the injunction is withheld, 3) a
favorable balance of hardships and 4) the effect on the public
interest. <u>Jean</u> v. <u>Mass. State Police</u>, 492 F.3d 24, 26-27 (1st
Cir. 2007); <u>Quincy Cablesys., Inc.</u> v. <u>Sully's Bar, Inc.</u>, 640 F.

Supp. 1159, 1160 (D. Mass. 1986).  Of these factors, the likelihood of success on the merits "normally weighs heaviest on the decisional scales." Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).

The Court may accept as true "well-pleaded allegations [in the complaint] and uncontroverted affidavits." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass. 2010) (quoting Elrod v. Burns, 427 U.S. 347, 350, n.1 (1976)). The Court may also rely on otherwise inadmissible evidence, including hearsay. See Asseo v. Pan Am. Grain Co., Inc., 805 F.2d 23, 26 (1st Cir. 1986).  Ultimately, the issuance of preliminary injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)).

The Court may extend temporary injunctive relief upon a showing of good cause. Fed. R. Civ. P. 65(b)(2).

**B.   Application**

**1.   The claims for injunctive relief by the lawful permanent residents**

On February 1, 2017, the White House distributed a memorandum to the Acting Secretary of State, the Acting Attorney General and the Secretary of Homeland Security clarifying that

Sections 3(c) and 3(e) of the EO do not apply to lawful permanent residents.

That memorandum comports with the language of the Section 3(c) which temporarily suspends "entry" of aliens from the seven subject countries.  Upon returning to the United States, lawful permanent residents do not, however, typically "enter" the country for purposes of the INA.

Although "entry" is no longer defined in the INA, it has been replaced with the term "admission," which is defined as

> the lawful <u>entry</u> of the alien into the United States after inspection and authorization by an immigration officer.

8 U.S.C. § 1101(a)(13)(A) (emphasis added); <u>see</u> <u>also</u> <u>Vartelas</u> v. <u>Holder</u>, 556 U.S. 257, 263 (2012) (explaining that Congress made "admission" the "key word" and removed the definition of "entry" from the statute).

Under the INA, lawful permanent residents are regarded as seeking admission, <u>i.e.</u> entry, into the United States only if they fall within six categories, including <u>inter</u> <u>alia</u>, being absent from the United States for 180 days or more. <u>See</u> <u>id.</u>; 8 U.S.C. § 1101(a)(13)(c).

Therefore, the use of the term "entry" in Section 3(c) indicates that the suspension was not intended to be applied to lawful permanent residents.

In light of the government's clarification that the EO will not be applied to lawful permanent residents, the claims for injunctive relief by plaintiffs Louhghalam, Tootkaboni, Sanie, Fatemeh Moghadam and Babak Moghadam are moot.  With respect to those individuals, there is "no ongoing conduct to enjoin". <u>Town of Portsmouth</u> v. <u>Lewis</u>, 813 F.3d 54, 58 (1st Cir. 2016).  Thus, any declaration with respect to the lawfulness of the EO would be strictly advisory. <u>See New Eng. Reg'l Council of Carpenters</u> v. <u>Kinton</u>, 284 F.3d 9, 18 (1st Cir. 2002) (remarking that it would be "pointless" to declare the constitutionality of a policy that had been revised during litigation).

Although the claims by the lawful permanent resident plaintiffs for injunctive relief are moot, the claims for injunctive relief by plaintiffs Renani and Amirsardary, holders of F-1 visas, and Oxfam are not covered by that clarification and thus the Court will address the merits of their claims for injunctive relief.

### 2. The claims for injunctive relief by the plaintiffs who hold F-1 Visas

#### a. Count I:  Equal Protection claim

The Fifth Amendment protects aliens within the United States from "invidious discrimination by the Federal Government." <u>Plyler</u> v. <u>Doe</u>, 457 U.S. 202, 210 (1982) (quoting <u>Mathews</u> v. <u>Diaz</u>, 426 U.S. 67, 77); <u>see also Yick Wo</u> v. <u>Hopkins</u>,

118 U.S. 356, 369, (1886) ("[Equal Protection is] universal in
[its] application, to all persons within the territorial
jurisdiction, without regard to any differences of race, of
color, or of nationality."). There is a distinction, however,
between the constitutional rights enjoyed by aliens who have
entered the United States and those who are outside of it. See
Zadvydas v. Davis, 533 U.S. 678, 693 (2001).

The decision to prevent aliens from entering the country is
a "fundamental sovereign attribute" realized through the
legislative and executive branches that is "largely immune from
judicial control." Chi Thon Ngo v. I.N.S., 192 F.3d 390, 395 (3d
Cir. 1999), amended (Dec. 30, 1999) (quoting Shaughnessy v.
United States ex rel. Mezei, 345 U.S. 206, 210 (1953)). Federal
classifications based on alien status are evaluated using
rational basis review. Mathews v. Diaz, 426 U.S. 67, 83 (1976)
(considering whether a law that made distinctions based on alien
status was "wholly irrational"); Ruiz-Diaz v. United States, 703
F.3d 483, 486-87 (9th Cir. 2012)(determining that a regulation
that treated immigrant religious workers differently than other
visa applicants would be evaluated using rational basis review);
Narenji v. Civiletti, 617 F.2d 745, 748 (D.C. Cir. 1979)
(upholding a regulation issued in response to the Iran hostage
crisis that required non-immigrant alien Iranian students to

provide information to Immigration and Naturalization Services Offices).

Rational basis review examines whether the "classification at issue bears some fair relationship to a legitimate public purpose." Plyler, 457 U.S. at 216.  It is "not a license for courts to judge the wisdom, fairness, or logic of legislative choices." Heller v. Doe by Doe, 509 U.S. 312, 319-20 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993)).  Under rational basis review, a classification is permissible "if there is any reasonably conceivable state of facts that could provide a rational basis." Id. (quoting Beach Communications, 508 U.S. at 313).

Plaintiffs contend that the EO discriminates on the basis of religion and was designed to exclude Muslims from the United States.  They further allege that it singles out citizens of seven different countries.  At oral argument, plaintiffs relied on "astonishing evidence of intent" from President Trump which, in their view, demonstrates that EO was "substantially motivated by improper animus." See Hunter v. Underwood, 471 U.S. 222, 233 (1985) (holding that a provision in the Alabama Constitution violated equal protection even through it was facially neutral because it was motivated by animus).  Defendants responded that the cases examining improper animus involve equal protection claims against states, which may be reviewed with strict

scrutiny, while the federal government classification of non-resident aliens in this case is subject to rational basis review.

Because the EO involves federal government categorizations with respect to non-resident aliens, rational basis review applies.  According to the EO, its purpose is

> to ensure the proper review and maximum utilization of available resources for the screening of foreign nationals, and to ensure that adequate standards are established to prevent infiltration by foreign terrorists . . . .

Exec. Order 13,769 § 3(c).  The EO specifically asserts that permitting aliens from the countries identified in section 217(a) of the INA, 8 U.S.C. § 1187(a)(12), to enter "would be detrimental to the United States."  The order provides a

> reasonably conceivable state of facts [which concerns national security and] that could provide a rational basis

for the classification. Heller, 509 U.S. at 319-20. Accordingly, this Court declines to encroach upon the "delicate policy judgment" inherent in immigration decisions. Plyler, 457 U.S. at 225.

### b.   Count II:  Establishment Clause claim

With respect to Count II, plaintiffs allege that the Executive Order violates the Establishment Clause of the United States Constitution. See U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion . . . ."). Specifically, plaintiffs claim that the EO disfavors Islam and

favors Christianity.  The Court concludes, however, that the remaining plaintiffs lack standing to raise an Establishment Clause challenge.

The purported harmful disparate treatment of those two faiths arises from Section 5(b) of the EO in which the Secretary of State is directed, upon reinstatement of USRAP, to

> prioritize <u>refugee</u> claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality (emphasis added).

To have standing, plaintiffs must allege an injury in fact that is "concrete and particularized". <u>Reddy</u> v. <u>Foster</u>, Docket No. 16-1432, 2017 WL 104825, at *4 (1st Cir. Jan. 11, 2017) (quoting <u>Susan B. Anthony List</u> v. <u>Driehaus</u>, 134 S. Ct. 2334, 2341 (2014)).

Plaintiffs are not, however, refugees seeking admission to the United States and consequently, any future implementation of Section 5(b) would not personally affect them.  Although plaintiffs vigorously disagree with such a policy, that sincere disagreement is insufficient injury to confer standing. <u>See</u> <u>Valley Forge Christian Coll.</u> v. <u>Ams. United for Separation of Church & State, Inc.</u>, 454 U.S. 464, 485-86 (1982) ("They fail to identify any personal injury suffered by them as a consequence of the alleged constitutional error, other than the psychological consequence presumably produced by observation of

-12-

conduct with which one disagrees.  That is not an injury sufficient to confer standing under Art. III . . . .” (emphasis removed)).

Moreover, the language in Section 5 of the EO is neutral with respect to religion.  Plaintiffs submit in their amended complaint that Section 5 favors Muslims over Christians, in violation of the Establishment Clause.  The provisions of Section 5, however, could be invoked to give preferred refugee status to a Muslim individual in a country that is predominately Christian.  Nothing in Section 5 compels a finding that Christians are preferred to any other group.

### c.   Count III: Due Process claim

The power to admit or exclude aliens is a sovereign prerogative” and aliens seeking admission to the United States request a “privilege.” Landon v. Plasencia, 459 U.S. 21, 32 (1982).  It is “beyond peradventure” that “unadmitted and non-resident aliens” have no right to be admitted to the United States. Adams v. Baker, 909 F.2d 643, 647 (1st Cir. 1990).

There is no constitutionally protected interest in either obtaining or continuing to possess a visa.  The due process guaranteed by the Fifth Amendment “attaches only when the federal government seeks to deny a liberty or property interest.” Knoetze v. U.S., Dep't of State, 634 F.2d 207, 211 (5th Cir. 1981).  A non-citizen has no “inherent property right

in an immigrant visa." <u>Azizi</u> v. <u>Thornburgh</u>, 908 F.2d 1130, 1134 (2d Cir. 1990); <u>see also</u> <u>Legal Assistance for Vietnamese Asylum Seekers</u> v. <u>Dep't of State, Bureau of Consular Affairs</u>, 104 F.3d 1349, 1354 (D.C. Cir. 1997) (holding that aliens "may not assert a Fifth Amendment right in challenging the procedures for granting immigrant visas"); <u>Knoetze</u>, 634 F.2d at 212 (concluding that "revocation of an entry visa issued to an alien already within our country has no effect upon the alien's liberty or property interests"); <u>De Avilia</u> v. <u>Civiletti</u>, 643 F.2d 471, 477 (7th Cir. 1981) (determining there is "no vested right in the issuance of a visa").  Thus, because an alien does not enjoy a property right in a visa, he has no due process right that protects the manner in which a visa is revoked.

Conversely, because the Due Process Clause safeguards all "persons" in the United States, once an alien is in this country, that alien is entitled to Fifth Amendment protection. <u>Zadvydas</u>, 533 U.S. at 693.  It is "well established" that aliens have cognizable due process interests which must be protected in deportation hearings. <u>Demore</u> v. <u>Kim</u>, 538 U.S. 510, 523 (2003) (quoting <u>Reno</u> v. <u>Flores</u>, 507 U.S. 292, 306 (1993)).  At a minimum, before deportation, aliens are entitled to "notice of the nature of the charges and a meaningful opportunity to be heard." <u>Choeum</u> v. <u>I.N.S.</u>, 129 F.3d 29, 38 (1st Cir. 1997).

The plaintiffs who hold F-1 Visas, Ms. Renani and Ms. Amirsardary ("the F-1 plaintiffs"), contend that the EO violates their due process rights guaranteed by the Fifth Amendment because it prevents individuals from the targeted countries from coming into the United States without any procedural safeguards. Moreover, they submit that they fear leaving the country because of concerns about being unable to return.  Defendants respond that such fears are premature because neither of the F-1 plaintiffs has specific travel plans within the next month.

The F-1 plaintiffs have not demonstrated that they are likely to succeed on the merits of their due process claim.  It is not clear whether the F-1 visas of aliens in the United States at the time of the EO have been revoked, although defendants' counsel stated at the hearing that he thought they had been.  Assuming their visas have been revoked, the F-1 plaintiffs have no property or liberty interest in those visas and thus no due process claim with respect to the supposed revocation. Knoetze, 634 F.2d at 212.

Although the F-1 plaintiffs certainly would be protected by the Due Process Clause in the Fifth Amendment if deportation proceedings were initiated against them, Demore, 538 U.S. at 523, there is no indication that such proceedings are forthcoming.  Furthermore, while this Court is sympathetic to the difficult personal circumstances in which these plaintiffs

find themselves, if they choose to leave the country, as non-resident aliens, they have no right to re-enter. Landon, 459 U.S. at 32.  In sum, because due process protections do not apply to visas and the F-1 plaintiffs are not currently subject to deportation proceedings, they have not demonstrated a likelihood of success on the merits of a due process claim at this time.

### d.  Count IV:  Administrative Procedure Act claim

The Court concludes that plaintiffs have not shown a likelihood of success on the merits with respect to Count IV, in which plaintiffs allege that the EO violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

In Franklin v. Massachusetts, 505 U.S. 788, 800-01 (1992), the United States Supreme Court concluded that the Presidency is not an "agency" as defined in the APA, § 701(b)(1), and thus actions by the President are not subject to the APA.  Courts have interpreted Franklin to prohibit review under the APA of actions by the President when he is exercising discretionary authority. See, e.g., Detroit Int'l Bridge Co. v. Gov't of Canada, 189 F. Supp. 3d 85, 104 (D.D.C. 2016).

Here, Congress has granted the President authority to suspend entry for any class of aliens if such entry would be "detrimental to the interests of the United States." 8 U.S.C.

1182(f).  Pursuant to, and without exceeding, that grant of discretionary authority, the President issued EO 13,769 and suspended entry of aliens from the seven subject countries.  The President's action is thus unreviewable under the APA. See Detroit Int'l Bridge, 189 F. Supp. 3d at 104-05 (concluding that the President's decision to allow a permit for an international bridge was not subject to the APA because he had the authority to do so under the International Bridge Act of 1972, 33 U.S.C. § 535 et seq.).

Because the likelihood of success element is "essential" to the issuance of an injunction, New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 13-14 (1st Cir. 2002), the Court will not continue to impose injunctive relief pursuant to Count IV.

### e.    Count V:  First Amendment claim

Finally, in Count V, Oxfam claims that the EO has violated its First Amendment rights to freedom of speech, association and petition by barring entry of aliens, including visa holders, into the United States.

The United States Supreme Court, in Kleindienst v. Mandel, 408 U.S. 753, 764, 770 (1972), explained that a denial of a visa to an alien could, under some circumstances, violate a United States citizen's First Amendment right "to receive information". The Court dismissed plaintiffs' First Amendment claim, however,

because the Attorney General provided a "facially legitimate and bona fide reason" for denying the alien's visa request.  In such case, the Court continued, lower courts should not

> look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant.

Id. at 770.

The First Circuit Court of Appeals ("First Circuit") has considered the bounds of Kleindienst on two occasions:  in Allende v. Shultz, 845 F.2d 1111 (1st Cir. 1988), and in Adams v. Baker, 909 F.2d 643 (1st Cir. 1990).  That Court concluded in Allende that plaintiffs adequately raised a First Amendment claim. 845 F.2d at 1116.  Conversely, in Adams, it held that plaintiffs' did not assert a valid First Amendment challenge. 909 F.2d at 649-50.  In both cases, however, the First Circuit undertook an analysis to determine whether the conduct of the individual who had been denied a visa fit within the statutory authority relied upon for those denials.

Here, the President has exercised his broad authority under 8 U.S.C. § 1182(f) to suspend entry of certain aliens purportedly in order to ensure that resources are available to review screening procedures and that adequate standards are in place to protect against terrorist attacks. Exec. Order 13,769 § 3(c).  Such a justification is "facially legitimate and bona

fide" and therefore Oxfam's First Amendment rights are not implicated. See Kleindienst, 408 U.S. at 770 (concluding that the First Amendment rights of American scholars and students were not violated when a Belgian scholar whom they invited to speak was denied entry into the United States).

Although at oral argument plaintiffs directed this Court to American Academy of Religion v. Napolitano, 573 F.3d 115, 137 (2nd Cir. 2009), which held that a "well supported allegation of bad faith" could render a decision not bona fide, that is not the standard in the First Circuit.  Therefore, in light of the "plenary congressional power to make policies and rules for exclusion of aliens," Kleindienst, 408 U.S. at 769, which pursuant to 8 U.S.C. § 1182(f), has been delegated to the President, the Court concludes that the government's reasons, as provided in the EO, are facially legitimate and bona fide.

Consequently, Oxfam has not shown a likelihood of success with respect to its claim in Count V. See Kleindienst, 408 U.S. at 770; Adams, 909 F.2d at 650.

### f.   Other preliminary injunction factors

Moving on to the other three factors considered for a temporary restraining order, Jean v. Mass. State Police, 492 F.3d 24, 26-27 (1st Cir. 2007), the potential for irreparable harm weighs in favor of plaintiffs.  The harm of being forced to choose between visiting loved ones, participating in a

prestigious doctoral program or founding a business, on the one hand, and staying in this country out of fear of being denied re-entry is painful to contemplate.  Oxfam faces some less life-size challenges but they are important nevertheless.

There are considerations on both sides with respect to a balancing of the hardships.  On the one hand, implementing an effective immigration regime that ensures the safety of all Americans is undoubtedly difficult.  On the other hand, the hardship to the professional and personal lives of the individual plaintiffs and to the operation of the Oxfam world-wide organization is palpable.

Finally, there are public interest considerations on both sides.  The rich immigrant history of the United States has long been a source of strength and pride in this country.  The individual plaintiffs in this case provide particularly compelling examples of the value that immigrants add to our society.  Conversely, the public interest in safety and security in this ever-more dangerous world is strong as well.

When the four factors that the Court must consider before imposing injunctive relief are considered collectively, likelihood of success on the merits weighs most heavily in the decision. Coquico, Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009).  Therefore, because plaintiffs have not demonstrated that they are likely to succeed on the merits of

any of their claims, an extension of the restraining order at the present time is not warranted.

## ORDER

For the forgoing reasons, the Court declines to impose any injunctive relief and will not renew the temporary restraining order that was entered on January 29, 2017 (Docket No. 6).

**So ordered.**

/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated February 3, 2017